In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 17-2282 & 17-2724

DE'ANGELO A. CROSS,

*Petitioner-Appellant,*

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellee,*

and

CARL LEO DAVIS,

*Petitioner-Appellant,*

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

_____

Appeals from the United States District Court for the
Eastern District of Wisconsin.
No. 15-C-1338 — **J. P. Stadtmueller**, *Judge*, and
No. 16-C-747 — **William C. Griesbach**, *Chief Judge*.

_____

JANUARY 10, 2018 — DECIDED JUNE 7, 2018

_____

Before WOOD, *Chief Judge*, HAMILTON, *Circuit Judge*, and BUCKLO, *District Judge*.[*]

WOOD, *Chief Judge*. When compliance with the U.S. Sentencing Guidelines was still understood to be mandatory, district courts were required to impose an extended term of incarceration on so-called career criminals. This class of repeat felons was limited to those previously convicted twice for drug crimes or crimes of violence. The latter offenses included any felony "involv[ing] conduct that present[ed] a serious potential risk of physical injury to another." U.S.S.G. § 4B1.2(a)(2) (1992); U.S.S.G. § 4B1.2(a)(2) (2000). We will call that definition of a crime of violence the "residual clause" in this opinion.

The Supreme Court jettisoned the mandatory nature of the guidelines in 2005, in its decision in *United States v. Booker*, 543 U.S. 220. The *Booker* decision did not, however, immediately affect sentences imposed on defendants previously. Thus, De'Angelo Cross and Carl Davis continued to serve obligatory sentences as career offenders as required by the mandatory guidelines. Both Cross and Davis qualified for that designation because of the residual clause. Their present appeal challenged the constitutionality of that clause.

Two recent developments form the backdrop for our decision: first, the Supreme Court's holding in *Johnson v. United States*, 135 S. Ct. 2551 (2015), that the identical language in the Armed Career Criminal Act, 18 U.S.C. § 924(e) (2012), is unconstitutionally vague; and second, the Court's ruling in *Beckles v. United States*, 137 S. Ct. 886 (2017), that *Johnson* does not extend to the post-*Booker* advisory guidelines, including the

---

[*] Of the Northern District of Illinois, sitting by designation.

career-offender guideline. We conclude that *Beckles* applies only to advisory guidelines, not to mandatory sentencing rules. Under *Johnson*, the guidelines residual clause is unconstitutionally vague insofar as it determined mandatory sentencing ranges for pre-*Booker* defendants. Cross and Davis are both entitled to be resentenced.

**I**

Cross and Davis brought their cases to the district court through motions under 28 U.S.C. § 2255 for relief from their sentences. Each was unsuccessful before the district court and appealed to this court. In light of the substantial overlap in the issues presented, we consolidated their cases.

When the district court sentenced Cross (2000) and Davis (1992), the then-mandatory sentencing guidelines prescribed an elevated sentence for those denominated career offenders. U.S.S.G. § 4B1.1. A defendant qualified as a career offender upon his third felony conviction for either a crime of violence or a drug offense. *Id*. The guidelines defined the term "crime of violence" in three ways: an elements approach, U.S.S.G. § 4B1.2(a)(1); an enumerated offense approach, *id.* § 4B1.2(a)(2), first part; and the residual clause, *id.* § 4B1.2(a)(2), final clause. As we noted, the residual clause covered any offense that "involves conduct that presents a serious potential risk of physical injury to another." *Id*. Both Cross and Davis were sentenced as career offenders on the basis of the residual clause, and neither objected at trial. Davis did not file a direct appeal. Although Cross filed a notice of appeal (despite generally waiving his right to appeal or to file for collateral relief in his plea agreement), this court dismissed his case as frivolous after his attorney filed a no-merit brief to which Cross did not respond. *United States v. Cross*,

24 F. App'x 576, 577 (7th Cir. 2001); see *Anders v. California*, 386 U.S. 738, 744–45 (1967).

Since Davis's and Cross's convictions, the Supreme Court has dramatically altered the federal sentencing landscape. First, *Booker* demoted the federal sentencing guidelines from mandatory to advisory. 543 U.S. 220. Then *Johnson* struck down the residual clause of the Armed Career Criminal Act (ACCA) as unconstitutionally vague, overruling contrary decisions in *James v. United States*, 550 U.S. 192 (2007), and *Sykes v. United States*, 564 U.S. 1 (2011), and upsetting a host of decisions from every court of appeals in the country. The residual clause of the ACCA, which imposed increased minimum and maximum sentences, used identical language to that employed in the guidelines. Compare 18 U.S.C. § 924(e)(2)(B) (2012) with U.S.S.G. § 4B1.2(a)(2) (1992 and 2000). The Court subsequently declared *Johnson* retroactive. *Welch v. United States*, 136 S. Ct. 1257 (2016). Meanwhile, the Court applied the *ex post facto* clause to bar a retrospective increase in an *advisory* guidelines range. *Peugh v. United States*, 569 U.S. 530 (2013). Yet contrary to this circuit's expectations, see *United States v. Hurlburt*, 835 F.3d 715 (7th Cir. 2016) (*en banc*) (declaring the residual clause in the *advisory* guidelines void for vagueness under *Johnson*), the Court held in *Beckles* that the void-for-vagueness doctrine has no role to play in the *advisory* guidelines and upheld the use of the residual clause in that context, 137 S. Ct. 886.

In light of these developments and within one year of *Johnson*, Cross and Davis each sought resentencing under 28 U.S.C. § 2255. In Cross's case, even though the judge expressed considerable sympathy for Cross's vagueness argu-

ment, he thought himself bound by this court's refusal to entertain vagueness challenges to the mandatory guidelines in *United States v. Brierton*, 165 F.3d 1133, 1139 (7th Cir. 1999), and advisory guidelines in *United States v. Tichenor*, 683 F.3d 358, 364–65 (7th Cir. 2012). Notwithstanding the fact that we had reversed course in *Hurlburt*, the judge "c[ould] not conclude with certainty that *Hurlburt*'s abrogation of *Tichenor* [and *Brierton*] remain[ed effective] notwithstanding *Beckles*," in which the Supreme Court abrogated the specific holding of *Hurlburt*. In the alternative, he held that the broad waiver of appellate rights in Cross's plea agreement could not be overcome, even though the appeal waiver permitted motions "based on … the sentencing court's reliance on any constitutionally impermissible factor."

A different district judge handled Davis's motion, but he too concluded that relief was not in order. He found that Davis's motion was barred by the one-year limitations period in 28 U.S.C. § 2255(f). He acknowledged that section 2255(f)(3) reopens the limitations period for an additional year from "the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review." *Id*. § 2255(f)(3). He also recognized that Davis filed his petition within a year of *Johnson*'s issuance. Nonetheless, the judge believed that the Supreme Court's invalidation of the residual clause in the ACCA did not carry over to the residual clause in the pre-*Booker*, mandatory version of the career-criminal sentencing guideline. In the alternative, he held that Davis qualified as a career offender under the elements clause of the guidelines. See U.S.S.G. § 4B1.2(a)(1) ("crime of violence" also includes any felony that "has as an element the use, attempted use, or

threatened use of physical force"). On that basis, he concluded that Davis was still a career offender notwithstanding *Johnson*.

## II

Because Cross's and Davis's appeals present legal, rather than factual disputes, we consider the district courts' conclusions *de novo*. *Delatorre v. United States*, 847 F.3d 837, 843 (7th Cir. 2017). We begin by explaining why we reject the various procedural hurdles that the government has raised as a bar to our reaching the merits of both these appeals.

## A

Cross and Davis each filed his section 2255 motion within one year of the Supreme Court's decision in *Johnson*. The government nonetheless argues that their motions were untimely. Federal prisoners "claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States" may ask the sentencing court to "vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). They must, however, file their motion within a specified time. *Id.* § 2255(f). The only limitation period potentially applicable to Cross's and Davis's cases runs for one year from "the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review." *Id.* § 2255(f)(3). *Dodd v. United States* clarifies that this limitation period begins when the Supreme Court declares a new right, not when courts first acknowledge that right to be retroactive. 545 U.S. 353, 356–60 (2005). Thus, the timeliness of Cross's and

Davis's motions hinges on whether the right they "assert[] was initially recognized by" *Johnson*. 28 U.S.C. § 2255(f)(3).

The government argues that *Johnson* recognized the invalidity of the residual clause only vis-à-vis the ACCA. Cross and Davis, unlike Johnson, were sentenced under the residual clause of the guidelines. The government concludes, therefore, that section 2255(f)(3) cannot help them, unless and until the Supreme Court explicitly extends the logic of *Johnson* to the pre-*Booker* mandatory guidelines. The Fourth and Sixth Circuits have both accepted this view. *Raybon v. United States*, 867 F.3d 625, 629–31 (6th Cir. 2017); *United States v. Brown*, 868 F.3d 297, 301–04 (4th Cir. 2017). The First Circuit has rejected it. *Moore v. United States*, 871 F.3d 72, 80–84 (1st Cir. 2017).

The government's approach suffers from a fundamental flaw. It improperly reads a merits analysis into the limitations period. Section 2255(f)(3) runs from "the date on which the right *asserted* was initially recognized by the Supreme Court." 28 U.S.C. § 2255(f)(3) (emphasis added). It does not say that the movant must ultimately *prove* that the right applies to his situation; he need only claim the benefit of a right that the Supreme Court has recently recognized. An alternative reading would require that we take the disfavored step of reading "asserted" out of the statute. See *Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is our duty 'to give effect, if possible, to every clause and word of a statute." (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)).

Here, Cross and Davis claim the right to be resentenced on the ground that the vague (yet mandatory) residual clause unconstitutionally fixed their terms of imprisonment. The right not to be sentenced under a rule of law using this vague language was recognized in *Johnson*. 135 S. Ct. at 2556–57 ("The

prohibition of vagueness in criminal statutes … appl[ies] not only to statutes defining elements of crimes, but also to statutes fixing sentences … . [T]he indeterminacy of the … residual clause … denies due process of law."); see also *Beckles*, 137 S. Ct. at 892 ("In *Johnson*, we applied the vagueness rule to a statute fixing permissible sentences. The ACCA's residual clause … fixed—in an impermissibly vague way—a higher range of sentences for certain defendants.").

We are satisfied that the requirements of section 2255(f)(3) are met. Under *Johnson*, a person has a right not to have his sentence *dictated* by the unconstitutionally vague language of the mandatory residual clause. Davis and Cross assert precisely that right. They complied with the limitations period of section 2255(f)(3) by filing their motions within one year of *Johnson*. See also *Vitrano v. United States*, 721 F.3d 802, 807–08 (7th Cir. 2013) (holding that the Supreme Court recognized the general right not to be subject to an enhanced sentence based on an understanding of the term "violent felony" that conflicted with *Begay v. United States*, 553 U.S. 137, 148 (2008), and thus holding motion under section 2255 untimely when it was filed more than a year after *Begay* was decided).

B

The government next raised the ubiquitous specter of procedural default. Because neither Cross nor Davis challenged the constitutionality of the residual clause at trial or on direct appeal, the government argues they are barred from doing so now.

As an initial matter, forfeiture and waiver can stymie an appellee as well as an appellant. In Cross's case, the government waived its procedural default argument vis-à-vis Cross

by failing to assert it adequately in the district court. Attempting to make the best of a bad showing, the government admits that it raised procedural default only "succinctly" in a footnote. This is not enough, as we have held repeatedly. *United States v. White*, 879 F.2d 1509, 1513 (7th Cir. 1989); see also *Harmon v. Gordon*, 712 F.3d 1044, 1053 (7th Cir. 2013).

In general, habeas corpus petitioners may not raise any issue that they might have presented on direct appeal. *McCoy v. United States*, 815 F.3d 292, 295 (7th Cir. 2016). A petitioner may, however, overcome procedural default by showing cause for the default and actual prejudice, *Bousley v. United States*, 523 U.S. 614, 622 (1998), or that "failure to consider the defaulted claim will result in a fundamental miscarriage of justice," *Johnson v. Loftus*, 518 F.3d 453, 455–56 (7th Cir. 2008). Cross and Davis have established their right to raise this claim by way of the "cause and prejudice" avenue. We thus have no need to discuss the question whether the "fundamental miscarriage of justice" approach might also support their motions.

We have no doubt that an extended prison term—which was imposed on both men as a result of their designation as career offenders—constitutes prejudice. See *Glover v. United States*, 531 U.S. 198, 203 (2001). That narrows our inquiry to whether they have shown cause for not objecting at trial. A change in the law may constitute cause for a procedural default if it creates "a claim that 'is so novel that its legal basis is not reasonably available to counsel.'" *Bousley*, 523 U.S. at 622 (quoting *Reed v. Ross*, 468 U.S. 1, 16 (1984)). In *Reed*, the Court identified three nonexclusive situations in which an attorney may lack a "reasonable basis" to raise a novel claim:

> First, a decision of this Court may explicitly overrule one of our precedents. Second, a decision may "overtur[n] a longstanding and widespread practice to which this Court has not spoken, but which a near-unanimous body of lower court authority has expressly approved." And, finally, a decision may "disapprov[e] a practice this Court arguably has sanctioned in prior cases."

*Reed*, 468 U.S. at 17 (quoting *United States v. Johnson*, 457 U.S. 537, 551 (1982)).

The government, relying on a footnote in *Richardson v. Lemke*, 745 F.3d 258, 274 n.7 (7th Cir. 2014), suggests that *Reed* is no longer good law. In *Richardson*, we assumed the validity of *Reed*, even as we noted that in *Prihoda v. McCaughtry*, 910 F.2d 1379, 1386 (7th Cir. 1990), we had questioned *Reed*'s continuing force after *Teague v. Lane*, 489 U.S. 288 (1989). Later cases, however, put our concerns to rest. The Supreme Court has since relied on *Reed*, see *Bousley*, 523 U.S. at 622, as have we, *e.g.*, *McCoy v. United States*, 815 F.3d at 295–96 (7th Cir. 2016); *McKinley v. Butler*, 809 F.3d 908, 912 (7th Cir. 2016). Moreover, *Prihoda* did not hold that legal change as understood by *Reed* could never constitute cause; rather, it said that legal change had to qualify as retroactive under *Teague* for the petitioner to prevail. *Prihoda*, 910 F.2d at 1385–86. In other words, we thought that legal change under *Teague* was concentrically nested within legal change under *Reed*, rendering the latter superfluous once a claim qualified under *Teague*. *Id*.

Cross and Davis could not reasonably have challenged the guidelines residual clause when the district court sentenced them in 1992 and 2000 respectively. On this point, we agree

with our sister circuits that "no one—the government, the judge, or the [defendant]—could reasonably have anticipated *Johnson*." *United States v. Snyder*, 871 F.3d 1122, 1127 (10th Cir. 2017) (quoting *United States v. Redrick*, 841 F.3d 478, 480 (D.C. Cir. 2016)). In fact, the *Johnson* Court expressly overruled its own precedent, 135 S. Ct. 2563 ("Our contrary holdings in *James*[, 550 U.S. 192,] and *Sykes*[, 131 S. Ct. 2267,] are overruled."), and so satisfied the first criterion of *Reed*. Although *Johnson* involved the ACCA rather than the career-offender guidelines, the language it evaluated was nearly identical to that in the career-offender guidelines. We acknowledge that the cases overruled by *Johnson* were not decided until 2007 and 2011—after the petitioners' sentencing—and thus could not themselves have influenced petitioners' failure to object at trial. Nonetheless, when the Supreme Court reverses course, the change generally indicates an abrupt shift in law. The alternative would be a case of waffling, where the overruled cases themselves rejected prior precedent and the later case merely restored a *status quo ante*. That is not our situation.

*Johnson* represented the type of abrupt shift with which *Reed* was concerned. Until *Johnson*, the Supreme Court had been engaged in a painful effort to make sense of the residual clause. In *James*, it took the position that the validity of the residual clause was so clear that it could summarily reject Justice Scalia's contrary view in a footnote. That footnote provided no argument, noted that the constitutional issue was not even "pressed by James or his *amici*," and took comfort from the broad use of "[s]imilar formulations" throughout the statute books. *James*, 550 U.S. at 210 n.6. Eight years later, the Court made a U-turn and tossed out the ACCA residual clause as unconstitutionally vague. We join the Tenth Circuit

in excusing, under *Reed*'s first category, the petitioners' failure to challenge the residual clause prior to *Johnson*. *Snyder*, 871 F.3d at 1125, 1127.

The second and third scenarios identified by *Reed* present even more compelling grounds to excuse Cross's and Davis's procedural defaults. *Johnson* abrogated a substantial body of circuit court precedent upholding the residual clause against vagueness challenges. *E.g.*, *Brierton*, 165 F.3d at 1138–39; *United States v. Presley*, 52 F.3d 64, 68 (4th Cir. 1995); *United States v. Argo*, 925 F.2d 1133, 1134–35 (9th Cir. 1991). Although most of these decisions postdate Davis's sentencing (though not Cross's), no court ever came close to striking down the residual clause before 1992 or even suggested that it would entertain such a challenge. Finally, the Supreme Court had implicitly "sanctioned" the residual clause by interpreting it as if it were determinate. *Stinson v. United States*, 508 U.S. 36 (1993); *Taylor v. United States*, 495 U.S. 575 (1990). Thus, the parties' inability to anticipate *Johnson* excuses their procedural default.

## III

### A

The government has also raised particular objections in each case. We begin with Davis's appeal. The government suggests that Davis's predicate conviction for robbery, to which the residual clause applied, also fell afoul of the elements clause of the guidelines. Thus, it says, regardless of the validity of the residual clause, the district court properly classified and sentenced him as a career offender. That argument may work in some cases, but it does not suffice here. Although

both parties acknowledge that Davis's robbery conviction satisfied the elements clause as understood at the time of his sentencing, *Curtis Johnson v. United States*, 559 U.S. 133 (2010), has since held that an offense must entail a greater degree of force to trigger that clause. (For the sake of clarity, we adopt the parties' practice of referring to *Curtis Darnell Johnson v. United States*, 559 U.S. 133, as *Curtis Johnson*; we will continue to refer to *United States v. Samuel James Johnson*, 135 S. Ct. 2551 (2015), as *Johnson*.). Davis's conviction cannot satisfy the heightened requirement of *Curtis Johnson*.

Davis's earlier conviction was for simple robbery. The guidelines designate a felony as a crime of violence if it "has as an element the use, attempted use, or threatened use of physical force against the person of another." U.S.S.G. § 4B1.2(1)(i). Interpreting the identical clause of the ACCA, *Curtis Johnson* held that "the phrase 'physical force' means *violent* force—that is, force capable of causing physical pain or injury to another person." 559 U.S. 133, 140 (2010). It further determined that Florida's crime of simple battery did not meet this threshold. *Id*. at 145. A Florida statute defined simple battery to include "[a]ctually and intentionally touch[ing] or strik[ing] another person against the will of the other." *Id*. at 136 (quoting FLA. STAT. § 784.03(1)(a)(1)). In determining whether a violation of the act triggered the elements clause, the Court was "bound by the Florida Supreme Court's interpretation" that "the element of 'actually and intentionally touching' … [was] satisfied by *any* intentional physical contact, 'no matter how slight,'" *id*. at 138 (quoting *State v. Hearns*, 961 So. 2d 211, 218 (Fla. 2007)), including "[t]he most 'nominal contact,' such as a 'ta[p] … on the shoulder without consent,'" *id*. (quoting *Hearns*, 961 So. 2d at 219). Florida's simple battery

law thus criminalized a greater variety of conduct than the force clause punished.

The same is true of Davis's conviction for simple robbery in Wisconsin. The relevant Wisconsin statute provides that robbery can be committed in two ways:

> (a) By using force against the person of the owner with intent thereby to overcome his or her physical resistance or physical power of resistance to the taking or carrying away of the property; or

> (b) By threatening the imminent use of force against the person of the owner or of another who is present with intent thereby to compel the owner to acquiesce in the taking or carrying away of the property.

WIS. STAT. § 943.32(1). The Wisconsin Supreme Court has expressly stated that the requisite force is "not to be confounded with violence" and the "degree of force used by the defendant is immaterial." *Walton v. State,* 218 N.W.2d 309, 312 (Wis. 1974); see also *Whitaker v. State,* 265 N.W.2d 575, 579 (Wis. 1978). *Walton* and *Whitaker* thus parallel the Florida Supreme Court's decision in *Hearns* by defining force to include nonviolent physical contact. Given this authoritative interpretation of Wisconsin law, section 943.32(1) does not trigger the elements clause under *Curtis Johnson.*

*Curtis Johnson,* of course, said nothing about the residual clause. It spoke only to the elements clause. *Curtis Johnson* thus provided Davis with no basis to move for resentencing under section 2255. Contrary to the government's assertion, nothing had happened that would have initiated the relevant limitation period under section 2255(f)(3). That provision has

meaning only if read in conjunction with the right it limits—a right that section 2255(a) creates. Section 2255(a) permits a motion to set aside a sentence by a prisoner "claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a).

Prior to *Johnson*, Davis had no basis to assert that his sentence was illegal and thus he could not claim a right to be released. *Curtis Johnson* did not change that fact: all it did was to eliminate the elements clause as a basis for Davis's status, which became entirely dependent on the residual clause. There matters stayed until *Johnson*. Only then could Davis file a nonfrivolous motion for relief. Section 2255(f)(3) applies a limitation period of one year from "the date on which the right asserted was initially recognized by the Supreme Court." 28 U.S.C. § 2255(f)(3). It was not until *Johnson* that the Supreme Court recognized Davis's asserted right "*to be released*" on account of an illegal or unconstitutional sentence. 28 U.S.C. § 2255(a) (emphasis added). Only by divorcing section 2255(f)(3) from section 2255(a) could one say that Davis's right to petition for his release ended before it began.

In support of its proposed rule, the government offers only an excerpt from a single case, *Stanley v. United States*, which held that *Curtis Johnson* rather than *Johnson* triggered the limitation period under section 2255(f)(3). 827 F.3d 562, 565 (7th Cir. 2016). But a closer look at *Stanley* demonstrates that it does not help the government. In *Stanley*, *Johnson* did not reopen the limitations period because, regardless of the constitutionality of the residual clause, only the elements clause had ever justified Stanley's sentence. *Stanley*, 827 F.3d at 565. The residual clause, and hence *Johnson*, was irrelevant. *Id*.

Moreover, we were careful to note that the prisoner might have relied on *Johnson* to trigger section 2255(f)(3) had he "decided not to press an argument about the elements clause at [his original] sentencing, or on appeal," because "the only consequence would have been to move a conviction from the elements clause to the residual clause." *Id.* That is precisely the situation presented here.

## B

Turning to Cross's case, the government argues that a waiver clause in his plea agreement bars him from bringing his motion under section 2255. Plea agreements are contracts through which defendants bargain away fundamental rights. *E.g.*, *United States v. Ingram*, 979 F.2d 1179, 1184 (7th Cir. 1992). We therefore construe plea agreements according to the ordinary principles of contract law, but with a heightened obligation both to secure for defendants the benefits of their negotiation and to restrict only those rights they properly relinquished. *E.g.*, *id.* ("Plea agreements, however, are 'unique contracts' and the ordinary contract principles are supplemented with a concern that the bargaining process not violate the defendant's right to fundamental fairness under the Due Process Clause."); *United States v. Quintero*, 618 F.3d 746, 751 (2010) ("'[W]e interpret the terms of the agreement according to the parties' reasonable expectations' and construe any ambiguities in the light most favorable to" the defendant), quoting *United States v. Woods*, 581 F.3d 531, 534 (7th Cir. 2009)); see also, *e.g.*, *United States v. Alcala*, 678 F.3d 574, 577 (7th Cir. 2012). A valid appeal waiver must speak in "express and unambiguous" terms. *Quintero*, 618 F.3d at 751; *United States v. Woolley*, 123 F.3d 627, 632 (7th Cir. 1997) (quoting *United States v. Hendrickson*, 22 F.3d 170, 174 (7th Cir. 1994). Contrary to the

government's assertions, we determine *de novo* whether a plea agreement satisfies this requirement. *Alcala*, 678 F.3d at 577; *Ingram*, 979 F.2d at 1184.

Cross's waiver of his right to bring a section 2255 motion was not unlimited. It did not include, for instance, a challenge to "the court's reliance on any constitutionally impermissible factor." Both the district court and government interpret that carve-out to encompass only a narrow set of factors read into all appeal waivers as a matter of constitutional law. Under this exception, even a blanket appeal waiver cannot foreclose a defendant's right to challenge the sentencing court's use of a constitutionally impermissible, identity-based factor such as race or gender. *E.g.*, *Jones v. United States*, 167 F.3d 1142, 1144 (7th Cir. 1999). According to the government, the written carve-out in Cross's agreement merely replicates this constitutional baseline and thus does not cover Cross's motion.

Cross reads the carve-out to include any unconstitutional input in sentencing. This is a reasonable interpretation. Even if we thought the government's reading were also reasonable, we would be left with an ambiguous waiver that should not apply to Cross's section 2255 motion. The language of the plea agreement does not limit the term "constitutionally impermissible factor" to the exceptions that we must read into all appeal waivers. A "factor," in its relevant sense, is simply "[a]n element or constituent, *esp*[*ecially*] one which contributes to or influences a process or result." *Factor*, OXFORD ENGLISH DICTIONARY (3d ed. Sept. 2014), http://www.oed.com/view/Entry/67512?rskey=tf2pMV&result=1&isAdvanced=false#eid. Courts routinely use the word factor to refer to mandatory-guidelines inputs. *E.g.*, *United States v. Booker*, 543 U.S. at 241–42 (noting that the guidelines

set sentencing ranges "based on various factors related to the
offense and the offender"); *Koon v. United States*, 518 U.S. 81,
92 (1996). The guidelines do the same, including with respect
to the career-criminal enhancement. *E.g.*, U.S.S.G. § 1B1.3.
Cross's designation as a career offender on the basis of the re-
sidual clause was a crucial element of the sentencing court's
guidelines calculation. It contributed directly to his resulting
sentence and was thus a factor in his sentence.

We are satisfied that the exception in Cross's waiver for
any "constitutionally impermissible factor" in sentencing co-
vers the alleged illicit use of the residual clause to calculate
his guidelines range. Cross thus retained the right to file the
present section 2255 motion.

## IV

Having dispensed with these procedural hurdles, we are
at last ready to resolve the central issue on appeal: whether,
under *Johnson*, relief is available to Davis and Cross. *Johnson*
establishes that the residual clause of the ACCA is unconsti-
tutionally vague. 135 S. Ct. at 2557. Therefore, if a) the residual
clause of the guidelines suffers from the same indeterminacy
and b) the constitutional requirement of clarity applies to the
mandatory guidelines, then we must declare that clause void
as well.

### A

*Johnson* homed in on a confluence of two factors that de-
prived the residual clause of the ACCA of sufficiently definite
meaning. 135 S. Ct. at 2557–58; see also *Sessions v. Dimaya*,
138 S. Ct. 1204, 1213 (2018). First, the ACCA clause required
judges to assess the risk of injury associated with a defend-
ant's prior convictions using a categorical approach. *Johnson*,

135 S. Ct. at 2557. In other words, "[i]t tie[d] the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements." *Id*. Second, it required judges to weigh the apparent danger posed by those idealized offenses against the nebulous metric of "serious potential risk." *Id*. at 2557. The "combin[ed] indeterminacy" concerning how much risk the crimes of conviction posed and the degree of risk required of violent felonies produced unacceptable "unpredictability and arbitrariness." *Id*. at 2558.

These same two faults inhere in the residual clause of the guidelines. It hardly could be otherwise because the two clauses are materially identical. The mandatory minimum provisions of the ACCA apply to defendants who "ha[ve] three previous convictions … for a violent felony or a serious drug offense." 18 U.S.C. § 924(e)(1). The statute defines "violent felony" as one that:

(i)     has as an element the use, attempted use, or threatened use of physical force against the person of another; or

(ii)    is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

18 U.S.C. § 924(e)(2)(B). Instead of referring to a "violent felony," the guidelines speak of a defendant's "ha[ving] at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1. Its definition of a "crime of violence," however, is identical to that of "vio-

lent felony" in the ACCA. A "crime of violence" is "any of-
fense under federal or state law, punishable by imprisonment
for a term exceeding one year that—

> (i)     has as an element the use, attempted use, or
>         threatened use of physical force against the per-
>         son of another, or
>
> (ii)    is burglary *of a dwelling*, arson, or extortion, in-
>         volves use of explosives, or otherwise involves
>         conduct that presents a serious potential risk of
>         physical injury to another.

U.S.S.G. § 4B1.2 (1992) (emphasis added); see also U.S.S.G.
§ 4B1.2 (2000) (replacing roman with arabic numerals and
adding a comma before "that" in the introductory clause). The
only linguistic difference between the two is italicized. In the
enumerated crimes section, burglary under the guidelines is
limited to burglary of a dwelling. Otherwise, the two defini-
tions are identical, as the Supreme Court has acknowledged.
See *Beckles*, 137 S. Ct. at 890 (describing the residual clauses as
"identically worded"). (Nitpickers may also notice that
ACCA and 1992 edition of the guidelines use roman numer-
als, while the 2000 edition adopted arabic numerals. We can-
not fathom why that should matter.)

*Johnson* confirmed that the categorical approach applies to
the residual clause of the ACCA. 135 S. Ct. at 2561–62; see also
*id*. at 2579–80 (Alito, J., dissenting). The majority gave three
reasons for doing so. All three of those reasons apply with
equal force to the guidelines. First, in the face of the Court's
consistent application of the categorical approach to the resid-
ual clause, the government did not, in *Johnson*, ask it to aban-
don that approach. *Id*. at 2562 (majority opinion). We too have

taken the position that the categorical approach applies to the guidelines without eliciting any objection from the government (either in this case or others). *E.g.*, *United States v. Woods*, 576 F.3d 400, 403–04 (7th Cir. 2009). Second, the ACCA "refers to 'a person who … has three previous convictions' for—not a person who has committed—three previous violent felonies or drug offenses." *Johnson*, 135 S. Ct. at 2562 (quoting in its entirety from *Taylor v. United States*, 495 U.S. 575, 600 (1990)). *Johnson* held that "[t]his emphasis on convictions indicates that 'Congress intended the sentencing court to look only to the fact that the defendant had been convicted of crimes falling within certain categories, and not to the facts underlying the prior convictions.'" *Id.* (quoting *Taylor*, 495 U.S. at 600 (1990)). Likewise, the guidelines refer to a defendant who "has at least two prior felony convictions of either a crime of violence or a controlled substance offense," rather than a person who has committed two prior felonies. U.S.S.G. § 4B1.1. Third, the Court noted the "utter impracticability of requiring a sentencing court to reconstruct, long after the original conviction, the conduct underlying that conviction." *Johnson*, 135 S. Ct. at 2551. That difficulty is just as acute under the guidelines as under the ACCA.

The additional words, "of a dwelling," in the guidelines' enumerated clause do not focus the meaning of the phrase "serious potential risk" in the residual clause that follows. It might once have been argued that narrowing the enumerated burglary offense allows a more precise analogy to be drawn to the degree of harm with which the residual clause is concerned. But the Supreme Court closed the door on this *noscitur a sociis* style argument in *Taylor*. *Taylor* faced the converse problem of trying to determine the meaning of "burglary" in the enumerated clause of the ACCA, and in particular

whether to read in the common-law requirement that a burglar must target a dwelling. 495 U.S. at 593–96. Although *Taylor* entertained the converse notion that the requirement of a "serious potential risk" of injury in the residual clause might inform the meaning of the enumerated offenses, the Court refrained from taking that approach:

> It could be argued, of course, that common-law burglary, by and large, involves a greater "potential risk of physical injury to another." § 924(e)(2)(B)(ii). But, even assuming that Congress intended to restrict the predicate offense to some especially dangerous subclass of burglaries, restricting it to common-law burglary would not be a rational way of doing so. The common-law definition does not require that the offender be armed or that the dwelling be occupied at the time of the crime. An armed burglary of an occupied commercial building, in the daytime, would seem to pose a far greater risk of harm to persons than an unarmed nocturnal breaking and entering of an unoccupied house. It seems unlikely that Congress would have considered the latter, but not the former, to be a "violent felony" counting towards a sentence enhancement.

*Id.* at 594. Thus, limiting the enumerated offense to burglaries of dwellings sheds no light on the degree of risk required in the residual clause.

The Supreme Court's recent decision in *Dimaya* reconfirms our view that the residual clause of the guidelines shares the weaknesses that *Johnson* identified in the ACCA. *Dimaya* concerned an analogous residual clause in 18 U.S.C. § 16, as incorporated into the Immigration and Nationality Act.

138 S. Ct. at 1210–11. The INA renders removable any "alien who is convicted of an aggravated felony at any time after admission," 8 U.S.C. § 1227(a)(2)(A)(iii), and precludes the cancellation of his removal and adjustment of his status by the Attorney General, *id*. § 1229b(a)(3), (b)(1)(C). The statute defines aggravated felony to include a "crime of violence … for which the term of imprisonment [is] at least one year." *Id*. § 1101(a)(43)(F). Section 16, in turn, contains the following definition of "crime of violence":

> (a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

> (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 16.

The Court turned to *Johnson* for guidance in how to read section 16. It found no principled difference between the two statutes: *Johnson*, it said, "is a straightforward decision, with equally straightforward application here." *Dimaya*, 138 S. Ct. at 1213. Section 16's residual clause suffered from indeterminacy in "just the same way" as the ACCA's. *Id*. at 1213. Both required a categorical approach to the predicate offenses, and both vaguely called for a "not-well-specified-yet-sufficiently-large degree of risk." *Id*. at 1216. In his concurrence, Justice Gorsuch highlighted the key parallels between the ACCA and statutory scheme at issue in *Dimaya* from which the Court's conclusion flowed:

> Just like the statute in *Johnson*, the statute here instructs courts to impose special penalties on individuals previously "convicted of" a "crime of violence." Just like the statute in *Johnson*, the statute here fails to specify which crimes qualify for that label. Instead, and again like the statute in *Johnson*, the statute here seems to require a judge to guess about the ordinary case of the crime and conviction and then guess whether a "substantial risk" of "physical force" attends its commission. *Johnson* held that a law that asks so much of courts while offering them so little by way of guidance is unconstitutionally vague. And I do not see how we might reach a different judgment here.

*Id.* at 1231 (Gorsuch, J., concurring). As we already have highlighted, each of those three hallmarks is shared by the guidelines. The guidelines speak of a defendant "convicted of" a crime of violence, do not specify the offenses belonging to the category, and leave judges to guess how much risk offenses must entail. Thus, to borrow Justice Gorsuch's phrase, we "do not see how we might reach a different judgment here."

In fact, the textual differences between the ACCA and guidelines pale in comparison to the differences between the ACCA and section 16: section 16 lacks an enumerated clause; its residual clause requires "physical force" rather than "physical injury"; it requires a "substantial risk" rather than a "serious potential risk"; and it additionally requires that the offense involve that risk "by its nature" and that the risk arise "in the course of committing the offense." Compare 18 U.S.C. § 16(b) with 18 U.S.C. § 924(e)(2)(B)(ii) and U.S.S.G. § 4B1.2(a)(i). In dissent, Chief Justice Roberts sought to distin-

guish *Johnson* on the basis of some of these differences, see *Dimaya*, 138 S. Ct. at 1235–37 (Roberts, C.J., dissenting), but the majority of his colleagues were unpersuaded, see *id*. at 1218 (majority opinion). Interestingly, the *Dimaya* majority considered whether the complete absence of an enumerated-offense clause in section 16 affected the indeterminacy of its residual clause. *Id*. at 1221. Resolving that question in the negative, the Court observed that the enumerated crimes of the ACCA had failed to establish a baseline degree of risk because they "were themselves too varied to provide such assistance." *Id*. ("Trying to reconcile them with each other, and then compare them to whatever unlisted crime was at issue, drove many a judge a little batty."). The guidelines did not reduce that diversity by substituting burglary *of a dwelling* in a list that includes extortion and use of explosives.

Although several justices in *Dimaya* did question the vitality of the categorical approach, their opinions do not undercut our interpretation of the guidelines for two reasons. First, only a minority of the justices cast aspersions on the categorical approach. Justice Thomas, joined in part by Justices Kennedy and Alito, did so in dissent. *Id*. at 1250–59 (Thomas, J., dissenting). Justice Gorsuch's concurrence reserved judgment on the issue for the future. *Id*. at 1232–33 (Gorsuch, J., concurring). Until that time, Justice Gorsuch assumed that the categorical approach did apply because, in part, the Supreme Court's "precedent seemingly requires this approach." *Id*. at 1232. If that was enough to persuade the Justice, it is more than enough for us. As a lower court, we are required to follow the Court's precedents until the Court itself tells us otherwise. Unless and until a majority of the Court overrules the

majority opinions in *Johnson* and *Dimaya*, they continue to bind us.[1]

---

[1] The Supreme Court recently vacated our judgments in *United States v. Jenkins* and *United States v. Jackson*, remanding those cases to us for reconsideration in light of *Dimaya*. *United States v. Jenkins*, No. 17-97, 2018 WL 2186183 (U.S. May 14, 2018); *United States v. Jackson*, No. 17-651, 2018 WL 2186185 (U.S. May 14, 2018). Those remands do not dictate our disposition of the present appeals. Our now-vacated opinions in *Jenkins* and *Jackson* had held that the residual clause of 18 U.S.C. § 924(c)(3)(B) was unconstitutionally vague, and in so doing had assumed that the clause required use of the categorical approach. *United States v. Jackson*, 865 F.3d 946, 952, 956 (7th Cir. 2017); see also *United States v. Jenkins*, 849 F.3d 390, 394 (7th Cir. 2017). The government had asked the Supreme Court to return those cases to us because *Dimaya* "suggest[ed] that a court could, consistent with the canon of constitutional avoidance, construe Section 924(c)(3)(B) to permit application of a non-categorical approach that considers the defendant's conduct." Supplemental Brief for the United States at 5, *Jenkins* & *Jackson*, 2018 WL 2186183 & 2018 WL 2186185 (U.S. Apr. 17, 2018) (Nos. 17-97 & 17-651). The government was careful to distance section 924(c)(3)(B) from one of the prime justifications for applying the categorical approach to the residual clause of section 924(e) of the ACCA, section 16(b), and the guidelines:

> A non-categorical approach … may make particular sense in the context of Section 924(c)(3)(B). Unlike Section 16(b) of the ACCA's residual clause, Section 924(c)(3)(B)'s definition of a "crime of violence" is never applied to a prior conviction, the specific facts of which may not be before the court. Section 924(c) instead employs the term "crime of violence" to describe the conduct involved in the *present* offense with which the defendant is charged.

*Id.* at 3–4. We will reserve for our reconsideration of *Jenkins* and *Jackson* whether that difference is enough to justify jettisoning the categorical approach for section 924(c)(3)(B). For the moment, it is enough for us to note that the guidelines, like sections 924(e) and 16(b), require courts to consider the defendant's *prior* offenses.

Second, with the exception of Justice Thomas, no justice swore off the categorical approach for the residual clause of the ACCA. *Id.* at 1253–54 (Thomas, J., dissenting). Rather, in the portion of his dissent joined by Justices Kennedy and Alito, Justice Thomas advocated abandoning that approach only when applying section 16. *Id.* at 1254–59 (Thomas, J., dissenting). In its place, he advocated an "underlying-facts approach"—*i.e.*, analyzing the crime as committed. In Justice Thomas's opinion, "both interpretations [were] linguistically possible," *id.* at 1255; however, he saw the diction and context of section 16 and, in particular, the doctrine of constitutional avoidance as counseling strongly in favor of the underlying-facts approach, *id.* at 1255–56.

In developing this argument, Justice Thomas was careful to distance section 16 from the factors that had justified adopting the categorical approach for the ACCA—factors that apply with equal force to the guidelines. First, adopting the underlying-facts approach for the ACCA would have raised Sixth Amendment concerns. Although those same concerns apply to the mandatory guidelines, see *Booker*, 543 U.S. 220, a jury right does not attach to immigration cases, *Dimaya*, 138 S. Ct. at 1256. When section 16 is applied to criminal cases, Justice Thomas suggested that the defendant's prior conduct should simply be indicted and proven at trial. Regardless of the merits of that suggestion (which *Johnson* rejected for the ACCA, see 135 S. Ct at 2580 (Alito, J., dissenting)), that forward-looking strategy cannot be applied to the now-concluded era of mandatory guidelines. Justice Thomas also invoked context in support of his view. He noted that in the unique setting of the INA the Supreme Court had required an underlying-conduct approach to identify other aggravated felonies. *Dimaya*, 138 S. Ct. at 1257. Finally, Justice Thomas

thought that the practical concerns that had motivated *John-son*, and which apply with equal force to the mandatory guidelines, did not obtain in the context of immigration proceedings. Immigration judges, rather than courts, would have to shoulder the burden of identifying past conduct. Justice Thomas thought that "those judges [were] already accustomed to finding facts about the conduct underlying an alien's prior convictions"—a task already imposed by other aspects of the INA—and there was no evidence that they had struggled to do so. *Id*. at 1257–58. The same cannot be said of judges' efforts to apply the guidelines residual clause.

### B

The penultimate question before us is whether a vagueness challenge directed against the guidelines is possible for defendants such as Cross and Davis whose sentences were handed down before *Booker*, when the guidelines were mandatory. If so, then they have a right to be resentenced because the residual clause that underlay both of their sentences suffered from the same vagueness that doomed its counterpart in the ACCA.

The answer to that question depends in the first instance on the breadth of the Supreme Court's holding in *Beckles*. In the context of a sentence imposed after the guidelines became discretionary, *Beckles* upheld the residual clause of the guidelines against a *Johnson*-inspired vagueness challenge. 137 S. Ct. at 890. The Supreme Court took care, however, to specify that it was addressing only the post-*Booker*, *advisory* version of the guidelines. It held "that the *advisory* Guidelines are not subject to vagueness challenges under the Due Process Clause," *id*. at 890 (emphasis added), and referred repeatedly to the "advisory Guidelines" throughout the opinion, *id*. at

890, 892, 894, 895, 896, 897. Indeed, it expressly distinguished *Johnson* on the ground that *Johnson* dealt with a binding residual clause:

> Unlike the ACCA … the advisory Guidelines do not fix the permissible range of sentences. To the contrary, they merely guide the exercise of a court's discretion in choosing an appropriate sentence within the statutory range. Accordingly, the Guidelines are not subject to a vagueness challenge under the Due Process Clause. The residual clause in § 4B1.2(a)(2) therefore is not void for vagueness.

*Id.* at 892. We take the Court at its word: the *Beckles* opinion applies only to the guidelines as they have been since 2005, not to the pre-*Booker* mandatory regime.

Even more importantly, *Beckles*'s logic for declining to apply the vagueness doctrine rests entirely on the advisory quality of the current guidelines. The vagueness doctrine ensures that a "law regulating private conduct by fixing permissible sentences provides notice and avoids arbitrary enforcement by clearly specifying the range of penalties available." *Id.* at 895. Those purposes distinguish vagueness from the *ex post facto* clause, which *Peugh* tells us does apply to the advisory guidelines. The *ex post facto* clause bars a retroactive law if it "creates a significant risk of a higher sentence." 137 S. Ct. at 895 (quoting *Peugh*, 569 U.S. at 550). Lengthening advisory guidelines terms increases the likelihood of prolonged sentences—thereby raising *ex post facto* concerns—because the advisory guidelines exert a powerful anchoring influence on judges. *Id.* at 894; *Peugh*, 569 U.S. at 541–42. In contrast, advi-

sory guidelines do "not implicate the twin concerns underlying vagueness doctrine—providing notice and preventing arbitrary enforcement," *Beckles*, 137 S. Ct. at 894:

> [E]ven perfectly clear Guidelines could not provide notice to a person who seeks to regulate his conduct so as to avoid particular penalties within the statutory range. That is because even if a person behaves so as to avoid an enhanced sentence … the sentencing court retains discretion to impose the enhanced sentence … . The advisory Guidelines also do not implicate … arbitrary enforcement … . An unconstitutionally vague law invites arbitrary enforcement … if it 'leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case' or permits them to prescribe the sentences or sentencing range available. The Guidelines, however, do not regulate the public by prohibiting any conduct or by 'establishing minimum and maximum penalties for [any] crime.' Rather, the Guidelines advise sentencing courts how to exercise their discretion within the bounds established by Congress.

*Id*. at 894–95 (quoting respectively *Giaccio v. Pennsylvania*, 382 U.S. 399, 402–03 (1996) and *Mistretta v. United States*, 488 U.S. 361, 396 (1989)) (alterations in original) (citations omitted). Thus, the vagueness doctrine does not prohibit including the residual clause in the *advisory* guidelines.

The *mandatory* guidelines did, however, implicate the concerns of the vagueness doctrine. *Beckles* reaffirmed that the void-for-vagueness doctrine applies to "laws that *fix the permissible sentences* for criminal offenses." 137 S. Ct. at 892. As

*Booker* described, the mandatory guidelines did just that. They fixed sentencing ranges from a constitutional perspective:

> The [mandatory] Guidelines … are not advisory; they are mandatory and binding on all judges. While subsection (a) of [18 U.S.C.] § 3553 of the sentencing statute lists the Sentencing Guidelines as one factor to be considered in imposing a sentence, subsection (b) directs that the court "*shall* impose a sentence of the kind, and within the range" established by the Guidelines, subject to departures in specific, limited cases. …

> The availability of a departure in specified circumstances does not avoid the constitutional issue … . The Guidelines permit departures from the prescribed sentencing range in cases in which the judge "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b)(1) (2000 ed., Supp. IV). At first glance, one might believe that the ability of a district judge to depart from the Guidelines means that she is bound only by the statutory maximum. … Importantly, however, departures are not available in every case, and in fact are unavailable in most. In most cases, as a matter of law, the Commission will have adequately taken all relevant factors into account, and no departure will be legally permissible. In those instances, the judge is bound to impose a sentence within the Guidelines range. …

> Booker's case illustrates the mandatory nature of the Guidelines. … Under these facts, the Guidelines

> specified an offense level of 32 … . Booker's is a run-of-
> the-mill drug case, and does not present any factors
> that were inadequately considered by the Commission.
> The sentencing judge would therefore have been re-
> versed had he not imposed a sentence within the level
> 32 Guidelines range.

*Booker*, 543 U.S. at 233–34 (emphasis in original). In sum, as the Supreme Court understood in *Booker*, the residual clause of the mandatory guidelines did not merely guide judges' discretion; rather, it mandated a specific sentencing range and permitted deviation only on narrow, statutorily fixed bases.

The Court thus addressed, and rejected, the argument that the possibility of departures from the mandatory guideline range was enough to make it advisory. We might add that even statutory minimum sentences are not exempt from departures, if, for instance, the government files a substantial-assistance motion, 18 U.S.C. § 3553(e), or the court finds that the defendant is entitled to the statutory safety valve, *id*. § 3553(f). Yet, as we know from *Johnson*'s treatment of the ACCA, statutory minima must comply with the prohibition of vague laws. The existence of some play in the joints is not enough to change the character of either statutory sentencing limitations or the pre-*Booker* guidelines from mandatory to advisory.

We conclude that the mandatory guidelines' incorporation of the vague residual clause impeded a person's efforts to "regulate his conduct so as to avoid particular penalties" and left it to the judge to "prescribe the … sentencing range available." *Beckles*, 137 S. Ct. at 894–95. Therefore, unlike the advisory guidelines, the mandatory guidelines implicated the "twin concerns" of the vagueness doctrine. *Id*. at 894. The

mandatory guidelines are thus subject to attack on vagueness grounds.

## C

The last question is whether *Johnson* applies retroactively to the residual clause of the career-offender guideline. A newly announced constitutional rule applies retroactively if it is either a substantive rule or a "watershed rule[] of criminal procedure." *Welch*, 136 S. Ct. at 1264 (quoting *Saffle v. Parks*, 494 U.S. 484, 495 (1990)). A substantive rule "alters the range of conduct or the class of persons that the law punishes," whereas procedural rules "regulate only the *manner of determining* the defendant's culpability." *Id*. at 1264–65 (quoting *Schriro v. Summerlin*, 542 U.S. 348, 353 (2004)). In *Welch*, the Supreme Court held that *Johnson* qualifies as a substantive rule, because it narrowed the class to whom the ACCA's mandatory minimum applied, *id*. at 1265:

> Before *Johnson,* the [ACCA] applied to any person who possessed a firearm after three violent felony convictions, even if one or more of those convictions fell under only the residual clause. An offender in that situation faced 15 years to life in prison. After *Johnson,* the same person engaging in the same conduct is no longer subject to the Act and faces at most 10 years in prison. The residual clause is invalid under *Johnson,* so it can no longer mandate or authorize any sentence. *Johnson* establishes, in other words, that "even the use of impeccable factfinding procedures could not legitimate" a sentence based on that clause. It follows that *Johnson* is a substantive decision.

*Id*. (quoting *United States v. U.S. Coin & Currency*, 401 U.S. 715, 724 (1971)).

The same logic justifies treating *Johnson* as substantive, and therefore retroactive, when applied to the mandatory guidelines. Just as excising the residual clause from the ACCA changed the punishment associated with illegally carrying a firearm, striking down the residual clause in the mandatory guidelines changes the sentencing range associated with Cross's and Davis's bank robberies. At the same time, it narrows the set of defendants punishable as career offenders for the commission of any number of crimes. In other words, *Johnson* has effectively changed Davis's and Cross's substantive crime for sentencing purposes from bank robbery by a career offender to simple bank robbery. Elimination of the residual clause of section 4B1.2(a)(2) (in its mandatory guise) thus "alters the range of conduct or the class of persons that the law punishes" and qualifies as a retroactive, substantive rule. *Welch*, 136 S. Ct. at 1264 (quoting *Schriro*, 542 U.S. at 353).

## V

We hold that both Cross and Davis are entitled to relief from their career-offender classifications, based on the Supreme Court's decision in *Johnson*. We thus REVERSE the district court and REMAND these cases with instructions to grant Cross's and Davis's section 2255 motions and to resentence them in accordance with this opinion.